## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Dekoven Kerr,

                Petitioner,      Case No. 13-cv-13369
                                    Hon. Judith E. Levy
v.                                Mag. Judge Mona K. Majzoub

Catherine Stoddard,

                Defendant.

_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS, DENYING A CERTIFICATE OF APPEALABILITY, AND DENYING PERMISSION TO PROCEED ON APPEAL *IN FORMA PAUPERIS*

Petitioner Dekoven Kerr, a state prisoner in the custody of the Michigan Department of Corrections, filed a petition for writ of habeas corpus challenging his Genesee Circuit Court jury trial convictions of second-degree murder, MICH. COMP. LAWS § 750.317, carrying a concealed weapon, MICH. COMP. LAWS § 750.227, and felony firearm possession, MICH. COMP. LAWS § 750.227b. As a result of these convictions, Petitioner is serving a term of life imprisonment for

murder, two to five years for carrying a concealed weapon, and a two-year consecutive term for being a felon in possession of a firearm.

The petition raises eight claims: 1) Petitioner's confession was coerced by threats to prosecute made by the police against his grandmother and girlfriend, 2) the trial court failed to instruct the jury on the lesser offense of voluntary manslaughter, 3) the trial court failed to declare a mistrial after an officer testified that an anonymous source identified Petitioner as the shooter, 4) prosecution witnesses were intimidated by the police to give false testimony, 5) the prosecution failed to exercise due diligence in locating eyewitnesses for trial, 6) the trial court erroneously limited cross-examination of a prosecution witness, 7) Petitioner's appellate attorney was ineffective, and 8) the criminal complaint and warrants were invalid, and witness statements should have been suppressed as a result.

The Court finds that all of Petitioner's claims are without merit and will deny the petition. The Court will deny a certificate of appealability with respect to Petitioner's claims and deny him permission to proceed on appeal *in forma pauperis*.

2

## I. Facts and Procedural History

This case involves the shooting death of Jaquan Dudley on a residential street in Flint, Michigan, on June 2, 2008. The same day Dudley was murdered, his father was sworn in as the Chief of the Flint Police Department.

The evidence presented at trial indicated that on the day of the shooting, the Flint Police Department responded to an emergency call at the Sussex Apartment complex. When Lieutenant Terry Speedy arrived, he found about thirty people standing around the lifeless body of Jaquan Dudley, who was lying face down barefoot with his pants below his knees. Speedy saw two bullet holes in Dudley's head. A subsequent autopsy revealed that Dudley had, in fact, been shot twelve times.

A car was sitting at the end of a nearby parking lot running, with its windshield wipers going. Shell casings were scattered around the car and elsewhere in the lot. Inside the car, Lt. Speedy saw one red tennis shoe on the passenger seat and another on the floor. One of the shoes

had a hole in the bottom. A marijuana-like substance was in the passenger seat, and there was possible blood on the car console.

According to the Genesee County Medical Examiner, Dr. Brian Hunter, all of the shots were fired at Dudley from more than three feet away. One gunshot, which entered through the left side of Dudley's jaw, was the only shot fired at a downward angle, which Dr. Hunter said would occur if a person was sitting down and was shot by someone standing up. A second gunshot wound entered the bottom of Dudley's sole, which Dr. Hunter testified was an unusual location and might occur if a person was shot while diving out of a window. Of four likely fatal shots, one hit the part of Dudley's brain stem controlling the heartbeat and was immediately fatal.

Police officers canvassed the area, but no one was willing to talk. An officer returned to the scene the following day, and eventually he obtained anonymous information directing the investigation towards Petitioner and the home of Crystal Frye. A defense motion for mistrial based on the repeated references to the anonymous tips was denied.

4

The police went to Frye's home and detained three people: Crystal Frye, Glenn Hammond, and Petitioner, who falsely identified himself as "Marcus Horatio Gray."

At trial, Deshawn Ferguson testified that he was Dudley's cousin. Ferguson admitted that he engaged in a fist fight with Dudley the day before the shooting because he believed that Dudley had snitched on him.

Ferguson testified that the morning Dudley was shot he was at home with his girlfriend and daughters when his god-sister Shay came over with her "baby daddy," Petitioner. Ferguson said Petitioner was hyper, and he was upset with Dudley for talking to Shay. Ferguson tried to explain to Petitioner that Dudley and Shay were not in a relationship, but Petitioner said he was going to "holler" at Dudley, which Ferguson testified could mean anything from talking to shooting. Ferguson testified that Petitioner showed him a black .40 caliber gun when he first arrived.

Ferguson testified that Petitioner wanted Shay to drop him off near the Sussex Apartments, and Petitioner was trying to call Dudley

5

at home before he left. Ferguson said he heard Petitioner speaking to Dudley on the phone, saying he wanted to buy some work, which was code for a drug transaction. Ferguson testified that two to three hours later his brother came over and told him that Dudley was dead. Ferguson first went to see his probation officer, and then went to the scene.

Ferguson testified that when he arrived at the scene, the police were there and a fist fight broke out among family members. He was involved in the fight, and some of his family members accused him of being the killer. Ferguson testified that Petitioner called him later in the day and said "I told you I was going to handle that, I'm going to holler at him."

On the advice of his landlord, a police officer, Ferguson eventually went to the police station. The word on the street was that Ferguson had been involved in the murder.  The police told him that he could be charged with murder and that his kids would be taken away. Ferguson denied having anything to do with the murder, and he told the police

6

that Petitioner said he was going to holler at Dudley. Ferguson was warned by police that he would be booked if he were lying.

Crystal Frye testified that she had known Petitioner for about a month and was in a sexual relationship with him. On the morning of Dudley's murder, Petitioner called her and asked her to pick him up at his grandmother's house next to the Sussex Apartments. Frye picked Petitioner up, and on her way there she did not hear sirens or see any emergency vehicles. She waited about two minutes for Petitioner, and then she heard and saw the emergency vehicles. As they drove back to her place, she asked Petitioner what happened, and he did not give her an answer. She then asked if he did something and he had "like a smirk" on his face. Frye then asked Petitioner if he shot somebody, and Petitioner answered that he had.

Petitioner explained to Frye that someone had broken into his baby's mother's house and he was not going to let anyone put his kids in danger. When they returned to Frye's house, her cousin Glen Hammond and her two girls were there. Frye heard Petitioner talking to someone on the phone, and he said, "it's over."

7

Frye testified that that night she left her kids at the house with Petitioner, Hammond, "Tutu" and another man. When Frye returned, she drove Petitioner to a location where he retrieved a shaving kit, and then Hammond cut Petitioner's hair.

The following day, Tutu and Petitioner came over to Frye's house and the three smoked marijuana. Frye recalled Tutu saying something about "the boy being naked." In response, Petitioner denied removing his clothes.

The next night, Frye saw a long gun in her house. She later called Petitioner a murderer, and he responded that he did what he had to do to protect his family. Frye told Petitioner to get rid of the gun, but the police arrived first, and she, Petitioner, and Hammond were arrested.

Frye was in custody for ten or eleven hours before she spoke to the police. After initially telling the police that Petitioner did not tell her anything about the shooting, the police told her that Hammond had already been released and that they could charge her with murder and that she would not be able to see her kids. At that point, she thought the police wanted her to say that she knew Petitioner had shot Dudley

8

and that if she told them what they wanted to hear, she would be released and could return to her children. The only reason she gave a statement was because she wanted to see her children again.

Frye received letters from Petitioner while he was in jail. In the letters, Petitioner mentioned not being charged if she did not come to court. Petitioner expressed hope that neither she nor Hammond would appear in court so he could go home. Petitioner also wanted to know what she had told the police, and he told her she needed to say that she was forced to say what she did.

Glenn Hammond testified that he was also held for about ten hours before he was interviewed by police. He initially told the police he did not know anything. Sergeant Angus told Hammond that he would be charged the same way as the murderer, and that he was going to speak to the prosecutor about breaking other deals with him. Angus told Hammond he was going to die in prison.

Hammond decided to talk to the investigators because he had been charged with accessory after the fact, with having guns, and with violating the terms of his probation. Hammond testified that he talked

9

only after he believed Petitioner had made a statement. At the time of trial, Hammond was still facing charges but testified that he had not been made any promises, although he hoped for lenient treatment.

Hammond testified that on the day of the murder, Petitioner and Frye arrived at Frye's house around noon. That evening Hammond received a phone call from a cousin, and after he told Petitioner about the call, Petitioner responded that someone was trying to kill him, and he asked Hammond to cut his hair. Hammond also told Petitioner that if he had anything to do with the murder he better get rid of the handgun Hammond had seen him with that day. The next time Hammond saw the gun it was in the kitchen, wrapped in a tee shirt with a belt around it. Hammond later saw Tutu take the handgun wrapped in the tee shirt and leave. Tutu returned fifteen minutes later carrying a rifle that was eventually seized by the police.

Hammond testified that he spoke with Petitioner about the shooting, saying that young guys cannot aim so they use "guns that spray." Petitioner responded that he shot the man at the Sussex Apartments both when he was in a car and from a distance. Petitioner

10

said he shot at the man while he was running until he fell when his pants fell down.

John "Tutu" Winfield testified that on the morning of the shooting he was in the parking lot of the Sussex Apartments with two other men. The three men were walking to the meat market to get breakfast when Petitioner and Frye pulled up. Petitioner got out of the car and started walking with them. Petitioner left, and the other three men continued to the market. Tutu did not see Petitioner with a weapon, although he knew Petitioner carried a large .40 caliber handgun every day.

After buying food, and preparing it at a nearby apartment, Tutu heard multiple shots fired. From the window, Tutu saw a car rolling with its wipers going and the driver's door open. Tutu saw the victim lying face down on the ground with his pants at his ankles, and he saw Petitioner on a side street heading towards his grandmother's house. Tutu spoke with Petitioner on the phone, and Tutu asked him what he had done. Petitioner said nothing and was breathing hard. The police arrived at the apartments within a few minutes. Tutu did not speak to them because "that can get you killed."

11

Tutu spoke a couple of hours later to Petitioner and told him that people were saying he was responsible for the murder. The following day Tutu was with Petitioner when he said he needed to get rid of the murder weapon. Petitioner went outside and came back in with a .40 caliber Hi-Point handgun that Tutu had seen Petitioner with the day before the murder. Petitioner wanted Tutu to sell the gun, but when Tutu said he could not, Tutu got rid of it instead. The gun was inside a tee-shirt with a belt wrapped around it. Tutu threw the gun in Devil's Lake and returned with a rifle he purchased so Petitioner could protect himself from retaliation.

According to Tutu, Petitioner told him he got into the car with the victim on the pretense of buying drugs. When the victim handed him the drugs, Petitioner jumped back out of the car, stepped around the front and started firing when he was by the driver's door. Petitioner said he hit the victim once, and he then jumped out of the passenger window and took off running. Petitioner then gunned him down from a distance. Petitioner told Tutu that it was a contract killing.

12

Tutu testified that he was arrested at his house, and he was booked on an open murder charge. Tutu made a statement, telling the police he disposed of the gun. Tutu was then charged with accessory after the fact and evidence tampering, crimes to which he pled guilty. As part of the deal he was not charged as a habitual offender. Charges of possession with intent to deliver cocaine and possession of fighting animals were also dismissed.

The police took Tutu to Devil's Lake to look for the gun. Sgt. Gaspar testified that it was like looking for a "needle in a haystack" because of the number of cars in the lake. No weapon was found.

Otis "Duck" McLeod testified that he was on disability and was walking with Tutu on the morning of the murder. Petitioner was on the phone, and he was not paying attention to him. McLeod went with Tutu back to an apartment, and while they were there they heard four or five shots. At some point, McLeod heard Petitioner say he had shot the victim. McLeod could not read the statement he made to the police, but after having it read to him, he testified that Petitioner told him he was

13

in the car, got drugs from the victim, and then walked around the car and shot him.

After Petitioner was arrested, his interrogation was videotaped. That videotape was played for the jury. During the initial part of the interview, Petitioner insisted that his name was Marcus Gray. Petitioner told the police that he was friends with Dudley. He said he was in the car with Dudley, and that his kids were on his lap. He also said that Dudley had dope on his lap and needed to make some sales. Sergeant Angus then told Petitioner that his grandmother was going to jail with him:

> The people that you're gonna put in jail with you if you don't work with [Sgt. Gaspar] and do this. . . . If you don't do this, you go in here and do you know who else you're gonna bring into this case?
>
> Your grandmother . . . Because that's where we went right after the shooting. That's the house that we came out the front door. And we went to a girl's car – a green Tahoe which was in the house with  you, [Crystal Frye]. We will bring her in and we will charge her – while she is here, we will charge her with a murder. She doesn't have to pull the trigger. She just has to be part of it. So when you call her and you ask for a ride and you get into that car, if you ran out your granny's front door and she drives you away, she's an accessory . . .

14

> She can be charged with murder just as – the way the person
> that can pull the trigger.

(Dkt. 15-2 at 49-50.)

Angus claimed to have recorded telephone conversations, telling Petitioner, "you are gonna pull in grandma, girlfriend, because they're accomplices." (Id. at 51.) Angus also repeatedly told Petitioner that he was going to die in jail. (Id. at 56.)

At this point in the interview, Petitioner told the police that he had heard shots, ran over and had to be dragged away from the victim's body. Angus referenced Petition's grandmother again, saying "the vultures are gonna take it and they're bringin' your grandma down," and that she was going to be arrested, jailed and forced to testify. (Id. at 65.) Petitioner again said that he had been there and bought some marijuana from the victim before he heard the shots. Petitioner said he held the victim in his lap and asked someone to call the police.

After more discussion, Petitioner finally explained that he shot the victim, who he still described as his partner, in self-defense during the course of an attempted armed robbery. (Id. at 80-81.) During the remainder of the tape, Petitioner gave varying accounts about where

15

the gun was and what happened to the gun after the shooting. Petitioner also made a written statement. In that statement, Petitioner said that he had killed Dudley protecting himself when Dudley attempted to rob him.

Petitioner testified at trial that his child's mother, Katrice Stewart, dropped him off the morning of the murder at the Sussex Apartments. He saw acquaintances of his, John "Tutu" Winfield, Otis, Trick, and Romie, and walked with them until he received a call from Crystal Frye. He did not see Dudley and he did not have a gun. Petitioner testified that he went to his grandmother's house where his sister and niece were, and he was there when he heard gunshots. He left and went to the store with his sister, and when he returned Crystal showed up.

Petitioner explained that he got his hair cut because people were calling and saying that he had something to do with the incident. The day after the murder, Tutu and McLeod came over and they discussed the rumors floating around the neighborhood. Petitioner said he denied involvement. He had a gun brought over to protect himself.

16

As for the interview, Petitioner explained that he gave a fake name because he thought there was a misdemeanor warrant out for him. Petitioner stated that the officers threatened his grandmother, and told him he would die in jail and be nailed to a tree. Out of fear for his grandmother, petitioner stated that he decided to give a false statement. He also stated that his statements to the police were lies, and he never admitted involvement to anyone else.

Petitioner's grandmother and sister corroborated Petitioner's testimony that he was with them at the time of the murder. Betty Wise, Petitioner's grandmother, testified that Petitioner and his sister Shemika and Shemika's daughter were at her home on the day of the murder. She was sleeping when she heard gunfire. Petitioner was sitting at the dining room table talking to his sister at the time. At some point Petitioner asked his sister to take him to the store, and he left the house ten minutes after she heard gunfire.

Petitioner's sister, Shemika, testified that she was at her grandmother's with Petitioner and her daughter the morning of the murder. When she heard the shots Petitioner was with her in the living

17

room, and her grandmother was in the bathroom. She and Petitioner left to go to the corner store, and when they returned, a green Tahoe came and picked him up.

Shemika denied telling Sgt. Angus that Petitioner had told her that he did not like the victim because of a girl, and she also denied telling him that Petitioner was gone from her grandmother's house for fifteen to twenty minutes because he had walked over to the Sussex Apartments to see what was going on.

The jury was instructed as to both first-degree and second-degree murder. The trial court denied the defense request for a manslaughter instruction. Petitioner was ultimately convicted of second-degree murder, carrying a concealed weapon, and felony-firearm.

Following his conviction and sentence, Petitioner filed an appeal in the Michigan Court of Appeals, raising the following claims:

> I. The trial court violated appellant's due process rights by admitting appellant's coerced confession obtained by threats to prosecute his grandmother for murder.
>
> II. Appellant was deprived of the due process right to be tried by a properly instructed jury when the trial court refused to deliver an instruction on the lesser included

18

offense of voluntary manslaughter despite the instruction being supported by a rational view of the evidence.

Petitioner also filed a supplemental pro se brief, raising additional claims:

I. The trial court erred in not granting defendant's motion for mistrial when a Flint police detective testified that she had an unknown source that said I was shooter in this case. The court should have declared a mistrial and discharged that jury at that point, as it is true you cannot "unring a bell" when it is brought out and I feel this witness brought that out intentionally to try and gain a conviction.

II. The court erred when the judge denied the defense request for a voluntary manslaughter instruction as a lesser charge of murder, where all the evidence presented a charge of voluntary manslaughter. This is most evident due to the fact that jury came back with a lesser charge.

III. There was error with an issue relating to the *Batson* issue during voir dire. That is that the government was trying to exclude black members from the jury.

IV. The district court abused its discretion in binding this matter over for trial, Count 1; first degree premeditate murder, there is no evidence on record to show that there is probable cause to show premeditation and deliberation; further, the district court abused its discretion in binding the defendant over on Count 2; CCW as there is insufficient

19

evidence to show that any weapon was concealed on the defendant at any time.

V. It was error to allow the prosecution to use testimony concerning prior consistent statements made by the prosecution's prime witness, an individual who had been charged with the same offense for which the defendant was convicted. Since the testimony of this witness was critical to the prosecution's case, the error cannot be said to be harmless.

VI. Reversible error occurred when the prosecutor improperly used the plea agreements of accessories who stated they agreed to testify truthfully to suggest some special knowledge on the prosecution's part that he told the truth.

VII. There was error by the prosecutor's remarks characterizing the defendant as a criminal and suggesting that his alibi witness perjured themselves. This was prejudicial and denied defendant a fair trial. Because the prosecutor's remarks made as a statement of fact certainly led the jury to think the prosecutor believed defendant was guilty.

VIII. The prosecutor may not base her argument on the credibility of witnesses or knowledge of facts and evidence not in the case. Since prosecutorial vouching for a witness's credibility is tantamount to presenting unsworn testimony, even a cautionary instruction may be insufficient to cure the error.

20

IX. It was error for the prosecution not to present persons at the scene of the crime as they are presumed to be witnesses able to testify regarding their observations. Prosecutors are required to endorse on the information the names of all persons and produce them at trial.

X. The defendant was deprived of the option of being convicted consistent with his theory as stated throughout his statement. Therefore the jury was deprived of the option of convicting the defendant consistent with the defendant theory and reversal is required.

XI. It was error to limit the scope of a hearing to determine whether any promises have been made to a prosecution witness charged with a crime so as to preclude cross examination of one prosecutor or the direct examination of another requested by the defense concerning alleged promises to a prosecution witness; such should include all witnesses and all evidence which can reasonably cast light on the questions to be determined.

XII. The police procedures were unprofessional and unethical. Neither the victims nor the defendant were tested for gun powder residue to determine if either was in fact firing a weapon.

XIII. It was error for the prosecutor not to request a change of venue, while it was clear that by the defendant's case being a high profile case involving the chief of police's son. It was a conflict of interest to allow the Flint Police to

21

investigate the case by that being the victim was their boss' son, another police agency should have been called in. It was also a conflict to hold the defendant's trial in Genesee County.

XIV. It is error for the prosecutor to allow government witnesses to perjure themselves knowing that they were threatened or forced to make and or change their testimony.

XV. It was error to allow defendant's co-defendant to make a statement against him after a plea bargain was offered and charges were dropped or reduced. It was given at the time when he had a motive to lie.

The Michigan Court of Appeals affirmed Petitioner's conviction in an unpublished opinion. *People v. Kerr*, No. 293384, 2010 WL 4492934 (Mich. Ct. App. Nov. 9, 2010). After addressing the claims raised in Petitioner's counsel's brief, the court found that Petitioner's supplemental brief contained fifteen unsubstantiated and abandoned statements that were nonetheless meritless.

Petitioner subsequently filed an application for leave to appeal in the Michigan Supreme Court, raising the following claims:

I. Failure to properly instruct the jury on voluntary manslaughter, failure to suppress my statement due to threats and promises, promises and threats made by the

22

prosecutor and the lead detective, not granting my motion for a mistrial when the police testified that she received a call from an unknown source saying I was the shooter.

II. The trial judge erred to allow prosecution to use testimony of prior consistent statements made by a witness who had been charged with the same crime which defendant was convicted. Since the testimony of this witness is critical to the case and it cannot be said to be harmless.

III. Allowing the prosecution to use statements from the police saying they received an anonymous tip saying Kerr was the shooter. Error occurred when the prosecution improperly used a plea agreement of accessories who stated they agreed to testify truthfully to suggest special knowledge.

IV. Allowing the prosecution to use testimony concerning prior consistent statements by prime witness, one originally charged with the crime. Since that testimony is critical, it cannot be said to be harmless. The cumulative effect of these errors mandate reversal and remand for a new trial. Further it would appear defendant was denied effective assistance of counsel by both trial and appellate counsel in his first appeal.

V. Reversible error occurred when the prosecutor improperly used the plea agreements of the accessories who stated they agreed to testify truthfully to suggest some special knowledge on the prosecution's part that he told the truth.

23

VI. Allowing the police witness to say she had an anonymous caller identify Kerr as the shooter in this matter. Ineffective assistance of counsel during the appeal.

VII. Made threats and promises to all the witnesses to testify on their behalf, and dropped or dismissed charges that would allow two of their witnesses to do life in prison.

The Michigan Supreme Court denied the application because it was not persuaded that the questions presented should be reviewed by the Court. *People v. Kerr*, 798 N.W.2d 11 (Mich. 2011) (table).

Petitioner returned to the trial court and filed a motion for relief from judgment, raising the following claims:

I. The trial court violated appellant's due process rights by admitting appellant's coerced confession, obtained via threats to prosecute his grandmother and girlfriend for murder.

II. Appellant was deprived of the right to be tried by a properly instructed jury when the trial court refused to deliver an instruction on voluntary manslaughter despite the instruction being supported by a rational view of the evidence.

III. The trial court erred in not granting defendant's motion for a mistrial when a Flint police detective testified that she had an unknown source who said he was the shooter.

24

IV. The prosecutor committed misconduct by intimidating witnesses and allowed her office to use testimony concerning prior inconsistent statements made by prime witnesses.

V. The prosecutor did not exercise due diligence in attempting to produce the witnesses at the defendant's trial, requiring reversal and remand for a new trial.

VI. A limitation on cross-examination which prevents a defendant from placing before the jury facts upon which an inference of bias, prejudice, or lack of credibility of a witness may be drawn amounts to an abuse of discretion and can constitute a denial of the right to confrontation.

VII. Appellate counsel was ineffective for failing to properly file Kerr's Standard 4 Supplemental Brief. Also, Kerr was improperly bound over for trial.

VIII. There was a *Batson* violation requiring a new trial.

The trial court denied the motion, finding "[p]ursuant to MCR 6.508(D)(2) [the] Court is precluded from considering issues previously raised and decided against the defendant in a prior appeal[.]" (Dkt. 15-18 at 3.)

Petitioner filed an application for leave to appeal in the Michigan Court of Appeals, raising the following claims:

25

I. The trial court violated appellant's due process rights by admitting his coerced confession obtained by threats to prosecute his grandmother and girlfriend for murder.

II. Appellant was deprived of his due process right to be tried by a properly instructed jury when the trial court refused to deliver an instruction on the lesser included offense of voluntary manslaughter, despite the instruction being supported by a rational view of the evidence.

III. The trial court committed error by not granting a mistrial after the prosecutor led the police officer to testify to the jury that she was told by an anonymous source (who refused to identify themselves) that the defendant shot the victim.

IV. The trial court erred when it allowed testimony by witnesses who were intimidated by police to change their original statements by threats, promises, and leniency.

V. The government erred when it failed to use due diligence to produce or attempt to present witnesses who were present at the scene.

VI. A limitation on cross-examination which prevents a defendant from placing before the jury facts upon which an inference of bias, prejudice, or lack of credibility of a witness may be drawn amounts to an abuse of discretion and can constitute a denial of the right to confrontation.

The Michigan Court of Appeals denied the application for leave to appeal for failure to establish entitlement to relief under Michigan Court Rule 6.508(D). (5/8/13, Mich. Ct. App. Order at 1.) Petitioner applied for leave to appeal this decision in the Michigan Supreme Court, raising the following claims:

I. Coercive police activity and promises of leniency and threats to falsely detain my family and friends.

II. Failure to properly instruct the jury, violation of my right to due process.

III. Prosecutor misconduct, police misconduct, judge abused his discretion by allowing the prosecution and police to prejudice the jury. False arrest, false imprisonment.

IV. False statements, accomplice testimony, preventing a witness from testifying freely.

V. Prosecution did not exercise due diligence to produce witnesses from the scene of the crime.

VI. Abuse of trial court discretion. Limitation on cross examination. Denial of right to confrontation.

VII. The felony complaint and the arrest warrant were not signed until after my arrest (no probable cause).

The Michigan Supreme Court denied the application for leave to appeal under Rule 6.508(D). *People v. Kerr*, 821 N.W.2d 554 (Mich. 2012) (table).

## II. Standard of Review

28 U.S.C. § 2254(d), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). "[T]he 'unreasonable application' prong of the statute permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S.86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. . . . As a condition for

29

obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 786-87 (internal quotation omitted).

To obtain relief under § 2254(d)(2), a petitioner must show an unreasonable determination of fact and that the resulting state court decision was "based on" that unreasonable determination. *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2012). However, a federal habeas court must presume the correctness of state court factual determinations. See 28 U.S.C. § 2254(e)(1). A petitioner may rebut this presumption only with clear and convincing evidence. *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).

### III. Discussion

### A. Procedural Default

Respondent asserts that Petitioner procedurally defaulted his third, fourth, fifth, sixth, and eighth claims in the state courts. While the procedural default doctrine precludes habeas relief on a defaulted claim, the procedural default doctrine is not jurisdictional. See *Trest v.*

30

*Cain*, 522 U.S. 87, 89 (1997). Thus, while a procedural default issue should ordinarily be resolved first, "judicial economy sometimes dictates reaching the merits of [a claim or claims] if the merits are easily resolvable against a petitioner while the procedural bar issues are complicated." *Barrett v. Acevedo*, 169 F.3d 1155, 1162 (8th Cir. 1999) (internal citations omitted); see also, *Lambrix v. Singletary*, 520 U.S. 518, 524-25 (1997) (noting that procedural default issue should ordinarily be resolved first, but denying habeas relief on a different basis because resolution of the default issue would require remand and further judicial proceedings); *Walters v. Maass*, 45 F.3d 1355, 1360 n.6 (9th Cir. 1995). Because it is more efficient to do so, the Court will proceed to the merits of all of Petitioner's claims.

## B. Coerced Confession

Petitioner's first claim asserts that his statement to police was involuntary because it was elicited by use of threats made against his grandmother and girlfriend. The claim was first presented to the trial court in a pre-trial motion to suppress that was denied after the trial court viewed a videotape of the statement. The Michigan Court of Appeals then rejected the claim during Petitioner's direct appeal.

The Fifth Amendment privilege against compulsory self-incrimination bars the admission of involuntary confessions. *Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986). The voluntariness of a confession is a mixed question of law and fact. *Thompson v. Keohane*, 516 U.S. 99, 108-11 (1995). In determining whether a confession is voluntary, the ultimate question is "whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution." *Miller v. Fenton*, 474 U.S. 104, 112 (1985).

The Michigan Court of Appeals rejected this claim on the merits as follows:

> Defendant first argues on appeal that his statement to police was involuntary. We disagree. A trial court's determination that a waiver was knowing, intelligent, and voluntary is reviewed de novo. *People v. Gipson*, 287 Mich.App. 261, 264 (2010). Deference is given to the trial court's assessment of the weight of the evidence and credibility of the witnesses, and the trial court's findings will not be reversed unless they are clearly erroneous. *People v. Shipley*, 256 Mich.App. 367, 372-373 (2003). A finding is clearly erroneous if it leaves this Court with a definite and firm conviction that a mistake was made. *Id*.
>
> Statements of an accused made during custodial interrogation are inadmissible unless the accused

32

voluntarily, knowingly, and intelligently waived his Fifth Amendment rights. *Miranda v. Ariz.*, 384 U.S. 436, 444 (1966); *People v. Daoud*, 462 Mich. 621, 633 (2000). A waiver is voluntary if it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. *Shipley*, 256 Mich.App. at 373-374. The voluntariness of a defendant's statements is determined by examining the totality of the circumstances surrounding the interrogation. *Daoud*, 462 Mich. at 633-634. In looking at the totality of circumstances surrounding the voluntariness of a confession, the trial court may consider the following factors:

> [1] the age of the accused; [2] his lack of education or his intelligence level; [3] the extent of his previous experience with the police; [4] the repeated and prolonged nature of the questioning; [5] the length of the detention of the accused before he gave the statement in question; [6] the lack of any advice to the accused of his constitutional rights; [7] whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; [8] whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; [9] whether the accused was deprived of food, sleep, or medical attention; [10] whether the accused was physically abused; and [11] whether the suspect was threatened with abuse. [*People v. Tierney*, 266 Mich.App. 687, 708, 703 N.W.2d 204 (2005) (quoting *People v. Cipriano*, 431 Mich. 315, 334, 429 N.W.2d 781 (1988)).]

No single factor is determinative in this inquiry. *Tierney*, 266 Mich. App. at 708. Rather, "[t]he ultimate test of admissibility is whether the totality of the circumstances surrounding the making of the confession indicates that it was freely and voluntarily made." *Cipriano*, 431 Mich. at 334. Generally, a false statement by an officer that induces a defendant to respond is not alone sufficient to make the statement involuntary. *People v. Hicks*, 185 Mich. App. 107, 113 (1990).

In reviewing the totality of the circumstances and giving deference to the trial court's assessment of the weight of the evidence and the credibility of the witnesses, we conclude that defendant's statements to Sergeant Mike Angus and Sergeant Leann Gaspar were voluntary. At the time of his statement, defendant was in his early twenties and had graduated from high school. Defendant was not deprived of food, sleep, or medical attention, and he was not injured, intoxicated, or drugged when he gave his statement. Defendant was not physically abused, or threatened with abuse. The interview was about an hour and a half long, and defendant was advised and waived his *Miranda* rights before speaking with the police officers. The trial court specifically noted that in watching the video of defendant's statement, it was clear that defendant did not adversely react to the officers' comments nor were his statements the product of his fear for his grandmother. The trial court did not err in determining that defendant's statements were voluntarily made, and it properly denied defendant's motion to suppress.

*Kerr*, 2010 WL 4492934, at *1-2.

34

The Court is concerned by the fact that the police in this case attempted to obtain a statement from Petitioner by threatening to charge his grandmother and girlfriend with murder even though there was no basis for such charges. The question here, however, is not whether this Court believes the officer's threats were potentially coercive. Rather, because the state court adjudicated this claim on the merits, the AEDPA limits the Court's inquiry to whether the state court's decision rejecting this claim reasonably applied the applicable established Supreme Court standard. Furthermore, in conducting this analysis the Court must defer to factual findings made by the state court absent clear and convincing evidence to the contrary. *See* 28 U.S.C. §2254(e)(1).

The state trial court viewed the videotaped interrogation and found that it "did not discern any reaction to [the threats] by the defendant in such a way as to indicate that those statements were the defining moments so to speak as to the defendant's statements." (Dkt. 15-8 at 8.) The court found, in effect, that the threats to Petitioner's family members did not produce his statements. In the trial court's opinion the tape indicated that Petitioner "held up" quite well during

35

questioning, that his statement did not change when the comments about his family members were made, and that even when he finally made a statement, he claimed he shot the victim in self-defense.

While the ultimate question of whether a confession is voluntary is not a purely factual one entitled to the nearly complete deference granted by §2254(e)(1), subsidiary factual questions – those of basic, primary, or historical fact in the sense of a recital of external events – are purely factual matters entitled to such deference. *See Miller*, 474 U.S. at 112. The finding by the trial court that Petitioner did not react to the threats seems to be a purely factual finding entitled to §2254(e)(1) deference. The finding is a description of an external event viewed by the court after watching the videotape. And because Petitioner has not offered clear and convincing evidence that this factual finding was incorrect, this Court is bound by the finding that Petitioner was not affected by the threats in a way that coerced his statements.

The Michigan Court of Appeals upheld the decision of the trial court by noting the trial court's factual finding and applying it to the settled constitutional standard for judging the voluntariness of

36

confessions. The legal conclusion of the state appellate court must stand on habeas review unless it constitutes an unreasonable application of clearly established Supreme Court law under §2254(d). But given that the legal conclusion of the state appellate court at least reasonably flowed from a presumptively true factual finding by the trial court, this Court has no choice but to conclude that the state court decision survives §2254(d) review. Accordingly, Petitioner's first claim does not merit habeas relief.

## C. Failure to Instruct on Manslaughter

Petitioner next claims that the state court's failure to instruct the jury on voluntary manslaughter violated the Due Process Clause of the Fourteenth Amendment. This claim fails because Petitioner cannot point to any "clearly established [f]ederal law" requiring a trial court to instruct the jury on a lesser-included offense in a non-capital case. § 2254(d)(1).

Federal courts may grant habeas relief only on the basis of federal law that has been clearly established by the Supreme Court. § 2254(d)(1). And the Supreme Court has never held that the Due Process Clause requires instructing the jury on a lesser included offense

in a non-capital case. *See Beck v. Alabama*, 447 U.S. 625, 638, n.14 (1980). "[T]he Constitution does not require a lesser-included offense instruction in non-capital cases." *Campbell v. Coyle*, 260 F.3d 531, 541 (6th Cir. 2001) (citing *Bagby v. Sowders*, 894 F.2d 792, 795-97 (6th Cir. 1990) (en banc)). Because the Supreme Court has never held that due process requires lesser-included offense instructions in a non-capital case, Petitioner's claim cannot form a basis for granting habeas relief. *See McMullan v. Booker*, 761 F.3d 662, 672 (6th Cir. 2014).

## D. Testimony Regarding Anonymous Informant

Petitioner next asserts that his trial was rendered fundamentally unfair by police officer testimony that anonymous witnesses directed their investigation towards Petitioner. Petitioner asserts that the testimony amounted to hearsay accusations by undisclosed witnesses that he was guilty of the offense.

Out-of-court statements that are testimonial in nature are barred by the Sixth Amendment Confrontation Clause unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness. *See Crawford v. Washington*, 541 U.S. 36, 68-69 (2004). However, the Confrontation Clause "does not bar the use of

38

testimonial statements for purposes other than establishing the truth of the matter asserted." *Id.* at 59 n. 9; *see also Tennessee v. Street*, 471 U.S. 409, 414 (1985) (defendant's rights under the Confrontation Clause were not violated by introduction of an accomplice's confession for the nonhearsay purpose of rebutting defendant's testimony that his own confession was coercively derived from the accomplice's statement). "In some circumstances, out of court statements offered for the limited purpose of explaining why a government investigation was undertaken have been determined not to be hearsay." *United States v. Gibbs*, 506 F. 3d 479, 486 (6th Cir. 2007) (quoting *United States v. Martin*, 897 F. 2d 1368, 1371 (6th Cir. 1990)). Evidence that is provided merely by way of background or is offered only to explain how certain events came to pass or why law enforcement officers took the actions they did is not offered for the truth of the matter asserted, and thus cannot trigger a Confrontation Clause violation. *See U.S. v.Warman*, 578 F. 3d 320, 346 (6th Cir. 2009) (quoting *United States v. Cromer*, 389 F. 3d 662, 676 (6th Cir. 2004)).

In the present case, the officers' testimony about the anonymous tip concerning Petitioner's involvement in the crime did not violate the

Confrontation Clause because it was not offered to prove the truth of the matter asserted, but appears to have been offered for the nonhearsay purpose of helping the jury understand the officers' investigation and why they ended up going to Frye's house and taking the occupants in for questioning. The officers did not testify about the contents of any out-of-court statements nor did they identify the source of their information. "Testimony that does not reveal any specific statement made by a confidential informant (or other nontestifying declarant) and merely provides background information regarding the course of investigation does not violate the Confrontation Clause." *United States v. Pugh*, 273 Fed. Appx. 449, 455 (6th Cir. 2008). Accordingly, this claim is also without merit.

## E. Police Intimidation of Witnesses

Petitioner asserts that his trial was rendered unfair in violation of due process because several witnesses were intimidated and threatened with prosecution if they did not perjure themselves at trial to help secure a conviction.

Prosecutors may not deliberately deceive a court or jurors by presenting evidence they know is false. *Giglio v. United States*, 405 U.S.

40

150, 153 (1972). Nor may they allow false testimony "to go uncorrected when it appears." *Napue v. Illinois*, 360 U.S. 264, 269 (1959). To prevail on a claim that the prosecutor relied on false testimony, a habeas petitioner must show: (1) the testimony was false, (2) the testimony was material, and (3) the prosecutor knew the testimony was false. *Amos v. Renico*, 683 F.3d 720, 728 (6th Cir. 2012), *cert. denied*, 133 S. Ct. 664 (2012).

Petitioner cannot demonstrate the first or third elements of a perjured testimony claim. He has not shown the testimony of any of the prosecution witnesses was false. Though Petitioner does not specify which witnesses this claim refers to, all of the witnesses who were taken into police custody appear to have been in some way threatened with prosecution before they gave statements. To the extent the testimony differed from the witnesses' police statements, Petitioner cannot show that it was the trial testimony that was false. All of the allegations of intimidation were disclosed at trial, and so the jury was aware of the circumstances under which the witnesses claimed their police statements were made.

41

Further, Petitioner has not shown that the prosecutor knew that the witnesses' trial testimony was false. This was a case of reluctant witnesses, each of whom might have had various motivations for testifying as they did. The prosecutor merely offered their testimony for the jury, and defense counsel ably revealed potential reasons for the jury to doubt their credibility.   There is no indication that the prosecutor knowingly offered false testimony. The claim is therefore without merit.

## F. Failure to Exercise Due Diligence to Locate Witnesses

Petitioner claims the prosecutor failed to produce witnesses for trial and failed to exercise due diligence in locating them for trial.

Violations of state law and procedure that do not infringe specific federal constitutional protections are not cognizable claims under Section 2254. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Federal law does not require the production of eyewitnesses. *Johnson v. Hofbauer*, 159 F. Supp. 2d 582, 601 (E.D. Mich. 2001). Michigan law's requirement that prosecutors produce *res gestae* witnesses is a matter of state law, and its enforcement is beyond the scope of federal habeas review. *See Collier v. Lafler*, 419 Fed. Appx. 555, 559 (6th Cir. 2011). "[U]nder

42

federal law, there is no obligation on the part of the prosecutor to call any particular witness unless the government has reason to believe that the testimony would exculpate the petitioner." *Atkins v. Foltz*, 856 F. 2d 192 (6th Cir. 1988) (table) (citing *United States v. Bryant*, 461 F. 2d 912, 916 (6th Cir. 1972)). Thus, whether a prosecutor exercised due diligence in attempting to locate a *res gestae* witness is outside the scope of federal habeas review. *Collier*, 419 Fed. Appx. at 559. This claim is therefore without merit.

## G. Limitation on Cross Examination

Petitioner asserts that his right to confront witnesses was violated when he was prohibited from cross-examining Deshawn Ferguson about an incident occurring a year prior where he retrieved a shotgun and shot at a house after getting into a fist fight. Petitioner argues that evidence about Ferguson's overreaction after the previous fight would have strengthened Petitioner's claim that Ferguson was the perpetrator in this case.

The Confrontation Clause of the Sixth Amendment to the United States Constitution guarantees defendants in criminal prosecutions "the right . . . to be confronted with the witnesses against him." U.S.

43

Const. amend. VI. This right "includes the right to cross-examine witnesses." *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (citing *Pointer v. Texas*, 380 U.S. 400, 404, 406-07 (1965)). The right of confrontation encompasses the right of cross-examination. *See Davis v. Alaska*, 415 U.S. 308, 315 (1974) ("The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination."). But the right of cross-examination is not absolute. Trial judges "retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). The exclusion of evidence is unconstitutional where it "infringe[s] upon a weighty interest of the accused." *Id.* (citing *Rock v. Arkansas*, 483 U.S. 44, 58 (1987)).

The Supreme Court has also explained that the Confrontation Clause does not "guarantee cross-examination that is effective in whatever way and to whatever extent the defense might wish." *Fensterer*, 474 U.S. at 20. The question is whether the trial court's

44

ruling allowed for "substantial compliance with the purposes behind the confrontation requirement," or, put another way, whether petitioner was "significantly limited in any way in the scope or nature of his cross-examination." *Green*, 399 U.S. at 166. Thus, "[s]o long as cross-examination elicits adequate information to allow a jury to assess a witness's credibility, motives, or possible bias, the Sixth Amendment is not compromised by a limitation on cross-examination." *United States v. Cueto*, 151 F.3d 620, 638 (7th Cir. 1998); *see also United States v. Larranaga*, 787 F.2d 489, 498 (10th Cir. 1986).

Contrary to Petitioner's allegation, the evidence of the prior shooting was admitted at trial. Prior to Ferguson's testimony, defense counsel requested permission to elicit testimony about a conviction resulting from a fistfight Ferguson had with another man a year before the victim's shooting, and that Ferguson had later opened fire at the home of the person. (Dkt. 15-9 at 82-85.) The trial court reviewed the case law provided by defense counsel and ruled that on cross-examination, he was able to ask Ferguson about the facts of the prior fight and shooting.  What he was not permitted to explore was the fact that Ferguson was convicted of charges related to that shooting. (Id. at

90.) Defense counsel then opened its cross-examination of Ferguson by eliciting an admission that he had the prior fight and then shot at the home of that person on the next day. (Id. at 117.) The jury was thus apprised of the fact that Ferguson admitted he had previously responded by shooting at a man he had fought with. Petitioner was only prevented from offering evidence that the incident also resulted in a conviction.  Because Petitioner was allowed to elicit the admission of the prior shooting, the limitation as to the prior conviction did not amount to a significant limitation on cross-examination. *Green*, 399 U.S. at 166. This claim is without merit.

## H. Ineffective Assistance of Appellate Counsel

Petitioner asserts that his appellate counsel was ineffective for failing to raise the claims Petitioner raised in his motion for relief from judgment that were not raised in his direct appeal, and for failing to assist Petitioner in the preparation and filing of his own *pro se* supplemental brief.  The Court has reviewed all of the claims, however, and it has found none of them have merit. It is not ineffective assistance for appellate counsel to decide not to raise meritless claims. *See Smith v. Murray*, 477 U.S. 527, 536 (1986); *Moore v. Mitchell*, 708 F.3d 760,

776 (6th Cir. 2013) ("[A] petitioner cannot show that appellate counsel was ineffective for failing to raise a claim on appeal if the underlying claim itself lacks merit."). Petitioner was not denied the effective assistance of appellate counsel because the claims he alleges counsel should have raised–or assisted Petitioner to better raise on his own–are all without merit.

## I. Invalid Complaint and Warrant

Petitioner asserts that his statement to police should have been suppressed because his arrest warrant was invalid. He also asserts that the police lacked a warrant or consent to search Frye's home. He concludes that the statements taken from Frye and Hammond therefore also should have been suppressed.

Review of this claim is precluded by the rule announced in *Stone v. Powell*, 428 U.S. 465 (1976). "[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Id.* at 482. "Michigan has a procedural mechanism which presents an

47

adequate opportunity for a criminal defendant to raise a Fourth Amendment claim." *Robinson v. Jackson*, 366 F. Supp. 2d 524, 527 (E.D. Mich. 2005). Because Michigan provides a procedural mechanism for raising a Fourth Amendment claim, and because Petitioner has not demonstrated that presentation of his claim was frustrated by a failure of that mechanism, he is not entitled to review of this claim.   The Court need not reach the question of whether the search and seizure were obtained in violation of the Fourth Amendment.

## IV. Conclusion

Because all of Petitioner's claims are without merit, the petition will be denied. Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a  certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473 (2000).

The Court finds that its resolution of Petitioner's claims is not reasonably debatable, and therefore no certificate shall be granted with respect to them. The Court will also deny Petitioner permission to proceed on appeal *in forma pauperis* because any appeal would be frivolous.

V. Order

Accordingly, the Court DENIES WITH PREJUDICE the petition for a writ of habeas corpus.

The Court further DENIES a certificate of appealability with respect to Petitioner's claims.

The Court further DENIES Petitioner permission to proceed on appeal *in forma pauperis*.

IT IS SO ORDERED.

Dated: September 10, 2015                    s/Judith E. Levy
Ann Arbor, Michigan                          JUDITH E. LEVY
                                             United States District Judge

49

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 10, 2015.

<u>s/Felicia M. Moses</u>
FELICIA M. MOSES
Case Manager